## East Boston Freight Railroad Company *vs.* Eastern Railroad Company.

Under special statutes of this commonwealth, showing by reasonable implication an intention on the part of the legislature to authorize such a conveyance, a mortgage executed in 1852 by the Grand Junction Railroad and Depot Company to the Eastern Railroad Company, of a portion of the railroad and franchise of the former corporation, to secure bonds to be issued by it and guaranteed by the latter corporation, was held to be valid.

Bill in equity brought by the plaintiffs as legal successors of the Grand Junction Railroad and Depot Company, alleging that a certain mortgage executed in 1852 by that company to the defendants, of a portion of their railroad and franchise, is void, and praying for a decree that the said mortgaged property may be surrendered to the plaintiffs, discharged of the mortgage. There was also a prayer for leave to redeem the property from the mortgage. The case was reserved for the determination of the whole court, upon facts which are sufficiently stated in the opinion.

*J. G. Abbott & B. Dean,* for the plaintiffs.

*B. F. Thomas,* for the defendants.

Wells, J.[*] The doctrine that a railway corporation cannot alienate its franchise is not founded upon any technical theory nor arbitrary rule; but upon the reasonable implication that such alienation would be contrary to the intention of the legislature, and subversive of the purposes for which the franchise

---

[*] Bigelow, C. J., did not sit in this case.

was granted. *Commonwealth* v. *Smith*, 10 Allen, 448. *Richard-son* v. *Sibley*, 11 Allen, 65. The same considerations apply, only perhaps with greater force, to the subdivision of the franchise by the transfer of a part. *East Boston Freight Railroad* v. *Hubbard*, 10 Allen, 459. But an alienation of the franchise, either in whole or in part, may undoubtedly be made, whenever there is legislative authority for it, either in express terms or by reasonable implication.

The franchise in controversy between these parties was originally granted to the Chelsea Branch Railroad Company. *St.* 1846, *c.* 212. By that act, authority was given to construct a branch road connecting the Eastern with the Boston and Maine Railroad. Section 9 authorized that corporation " to transfer all its property, rights, privileges and franchises under this act, either to the Boston and Maine Railroad Company, or to the Eastern Railroad Company, or to both of them, whenever either or both of said last mentioned corporations shall elect to receive and hold the same, in such manner and on such terms as shall be mutually agreed upon ; " and, " upon such transfer, all the powers and privileges hereby granted shall be vested in either or both of the said companies so purchasing and receiving the same." By *St.* 1847, *c.* 30, an additional franchise was granted to the same corporation, to construct a branch road from some convenient point in the line of their road before authorized, " near the easterly margin of the Winnisimmet Company's marsh," in Chelsea, crossing the Eastern Railroad, to some point near deep water in East Boston, " or to alter or discontinue so much of their granted road as lies northerly and easterly of the point at which the line of the branch hereby authorized commences, as may be deemed expedient." By *c.* 257 of the statutes of the same year, the corporation was authorized to take the name of the " Grand Junction Railroad and Depot Company ; " and by *St.* 1848, *c.* 264, it was authorized to extend its road in the opposite direction, by constructing a branch railroad crossing the Boston and Maine Railroad, and connecting with the Boston and Lowell and the Fitchburg Railroads. By this last act, the route of the road, as it approached the Boston and Maine

Railroad, was somewhat changed from that defined in the original act of 1846. The *St.* of 1847, *c.* 182, authorized the Eastern Railroad Company " to make such arrangements with the Chelsea Branch Railroad Company as shall be mutually agreed upon by said companies, for the construction, use and maintenance of one or more railroad tracks within the chartered routes of said Chelsea Branch Railroad, for the exclusive use of said Eastern Railroad Company," subject to the provisions contained in *Sts.* 1846, *c.* 212, and 1847, *c.* 30. By *St.* 1849, *c.* 201, the Eastern Railroad Company was authorized to construct " an extension " of its road from some point in North Chelsea " to the Salem turnpike, at or near the same point at which the Grand Junction Railroad and Depot Company are authorized to cross said turnpike," and thence by a defined route, by way of Somerville, into Boston.

In December 1851 the Eastern Railroad Company made an arrangement in writing with the Grand Junction Railroad and Depot Company, for the construction of two tracks for the exclusive use of the Eastern Railroad, within the chartered route of said Grand Junction Railroad and Depot Company, in accordance with *St.* 1847, *c.* 182. Before this arrangement was carried into effect, namely, in March 1852, a new arrangement was made, by which, instead of the construction of two new tracks, the Eastern Railroad Company took a lease for ten years of the two tracks of the Grand Junction Railroad and Depot Company, already built, and a mortgage of so much of its road as lies between the Salem turnpike and the Boston and Maine Railroad, to secure bonds of the Grand Junction Railroad and Depot Company for $140,000, to be issued by that corporation and guaranteed by the Eastern Railroad Company; and the arrangement for the construction of new tracks was postponed, without prejudice, until after the lease should expire. Directly following this arrangement, if not the fruit of it, was the *St.* of 1852, *c.* 306, approved May 21st 1852, whereby the two corporations, or either of them, were empowered to construct a branch railroad from some point upon the Grand Junction Railroad in Somerville, to run into Boston; and so much of the *St.* of 1849 " as authorized

the extension of said Eastern Railroad westerly beyond the Salem turnpike" was thereby repealed.

This history of the case seems to afford strong ground for the supposition that the legislature intended that the Eastern Railroad should have access to Boston by way of Somerville; that to this end three modes were, by successive acts of legislation, provided; *first,* by a full transfer of the road connecting the Eastern Railroad with the Boston and Maine Railroad, as provided in the *St.* of 1846, *c.* 212; *second,* by an arrangement for two separate tracks within the location of the Chelsea Branch Railroad, as provided in *St.* 1847, *c.* 182; *third,* by an independent location, under *St.* 1849, *c.* 201; that, upon this object being effected by the agreements of December 1851 and March 1852, the *St.* of 1852, *c.* 306, was passed, giving the right for the two corporations, whose interests were thus united, to have an independent access to the city for their joint use, and the right of the Eastern Railroad Company to construct a separate route through Chelsea to Somerville, being no longer requisite, was withdrawn. It can hardly be doubted that the whole state of the facts and of the relations between the two parties, established and subsisting under the previous acts of legislation upon the subject, was before the legislature and formed the ground of its action when the *St.* of 1852, *c.* 306, was adopted. If this is properly to be inferred from the facts of the case, then the last named act may be regarded as an implied approval and affirmance of the arrangement thus made between the two roads; and it is unnecessary to settle any doubts that might otherwise arise upon the question whether an advance of its credit by the Eastern Railroad Company to the Grand Junction Railroad and Depot Com pany, secured by a mortgage of so much of the road of the latter corporation as was within the line to which the arrange. ment applied, would be warranted as proper means by which to effect the "arrangement" authorized by the *St.* of 1847, *c.* 182.

But the defendants' title does not rest solely upon this mere constructive right of transfer. The *St.* of 1846, *c.* 212, authorized the transfer to the Eastern Railroad Company of the entire line of road connecting it and the Boston and Maine Railroad.

None of the subsequent acts have contained any repeal, or ex press modification or limitation of this power. The agreed facts state that " the road included within the defendants' mortgage was a portion of the road originally authorized by the first act creating the Chelsea Branch Railroad." But it is apparent that the mortgage embraces the whole line of the road which has been built within the franchise granted by that act. The second grant ( *St.* 1847, *c.* 30,) was of a road to commence within the *termini* of the first ; and the corporation was authorized to alter or discontinue so much of the original grant as was northerly and easterly of that point. As the Eastern Railroad Company has constructed its road, under authority of *St.* 1849, *c.* 201, as far as to the crossing of the Salem turnpike, at which point the line of road covered by the mortgage begins, and the plaintiffs' road extends no farther in that direction, it would seem that the Grand Junction Railroad and Depot Company had discontinued so much of its franchise, under the original act, as extended beyond the point of junction, and may be regarded as exercising its rights, from that point towards East Boston, under the second act ( *St.* 1847, *c.* 30).

The deed of mortgage, then, conforms to the power expressly given in the *St.* of 1846, *c.* 212, and needs no other justification. That power was " to transfer all its property, rights, privileges and franchises, under this act." The mortgage does transfer all its franchises, so far as exercised or enjoyed under that act ; and if, by reason of the alteration of its route at the westerly end of this line, under *St.* 1848, *c.* 264, that part of the road must be regarded as constructed under the new franchise granted by that act, and not under the original one by way of substitution, still the including of that portion would not invalidate the operation of the mortgage upon so much of the road as was constructed within the limits of the franchise originally granted. But as the right of transfer in *St.* 1846 contemplated the acquisition by the Eastern Railroad of a branch road by which to connect with the Boston and Maine Railroad, and as this right was not declared to be withdrawn or limited by *St.* 1848, which changed the course of that contemplated link of connection, at the

westerly end, the argument is very strong that the right extends, by implication, to the substituted route. It is sufficient, however, for the disposition of this suit, that the mortgage is held to be valid upon so much of the plaintiffs' road as was constructed exclusively under the powers granted in the original act of 1846. The plaintiffs succeed to such rights only as could have been enforced by the Grand Junction Railroad and Depot Company. Those rights are to redeem from the mortgage whatever port on of its road is affected by the legal operation of that deed. Its remedy is in equity, and subject to the condition that the plaintiffs must do equity. Upon no principle of equity can the plaintiffs be entitled to redeem the mortgage without payment of the whole amount justly due upon the debt which it was given to secure. If it should be held, therefore, that so much of the present road, included in the mortgage, as was constructed upon the altered route authorized in 1848, could not be legally conveyed, so that the mortgage would vest in the Eastern Railroad Company only the middle portion of that branch, the result would be the same, so far as the decree in this suit is concerned. However small that portion, the plaintiffs must redeem by paying the mortgage debt, or submit to a foreclosure.

The objection to the mortgage on the ground that the vote of the stockholders of the Grand Junction Railroad and Depot Company, by which it was ratified, was passed without proper notice of the proposed action, is not one upon which the plaintiffs can found any strong equities, and it has not been pressed n the argument. Neither is the plaintiffs' position strengthened oy the objections that one railroad corporation has no authority and could not legally guarantee the bonds of another road, and that " the money obtained on the bonds was not required, and could not be used in any manner that would benefit the Eastern Railroad." The want of equity of these objections, coming from the Grand Junction Railroad and Depot Company or its successor and representative, should silence them. But whatever force they might have had if set up by the Eastern Railroad Company in answer to an attempt to enforce the guaranty it does not follow that they are equally applicable against that

corporation, after it has actually paid and become the holder of the bonds.

It is not contended that the bonds were not valid and binding upon the Grand Junction Railroad and Depot Company. They were issued before the *St.* of 1854, *c.* 286, was passed. If the guaranty of the Eastern Railroad Company was invalid, it was so from mere incapacity, and not from any illegality which would defeat the right to hold the security for the return of money paid in its fulfilment. Upon recurring to the mortgage itself, it appears that by its terms it was conditioned to indemnify the Eastern Railroad Company not only against all liabilities incurred by the guaranty, but also " against all payments, losses and expenses which shall be made by or shall accrue to said Eastern Railroad Company by reason " thereof.

It is also urged that the provision in the *St.* of 1847, *c.* 182, authorizing the Eastern Railroad Company to take stock in the Grand Junction Railroad and Depot Company, is exclusive of any other mode in which it could furnish aid to or acquire an interest in the property or franchise of the other road. But the more reasonable construction seems to be that the taking of stock was authorized because it might not otherwise be considered as a legitimate means of effecting the " arrangement " proposed ; that it was rather intended to enlarge the implied powers, and perhaps to indicate the range within which the object sought by the act might be accomplished. It does not seem to have been intended to exclude any other reasonable mode of carrying the purpose authorized into effect.

The case must accordingly stand for further hearing, to determine the amount due to the Eastern Railroad Company, upon payment of which the plaintiffs will be entitled to be restored to possession of the property ; and for such other proceedings and orders as may be necessary to secure the rights of both parties.